220 So.2d 605

John T. STOCKLEY

v.

ALABAMA POWER COMPANY et al.

6 Div. 515.

Supreme Court of Alabama.

March 13, 1969.

John H. Brewer and Hare, Wynn, Newell & Newton, Birmingham, for appellant.

Martin, Balch, Bingham, Hawthorne & Williams, and Jesse S. Vogtle, Birmingham, for appellees.

HARWOOD, Justice.

The case below was tried upon Counts A, B, C, and D, of the complaint as amended.

Each count alleged that the plaintiff, appellant here, was employed by the Alabama By-Products Corporation, hereinafter designated as A B C, to work in a coal mine where he sustained totally disabling injuries in an accident due to the negligent maintenance of the works, ways, and machinery in the mine.

Each count further alleges that the defendants either had control of the mining premises or had undertaken to control them and owed a duty to the employees of A B C to provide reasonably safe works, ways, and machinery for the performance of their duties; that the defendants had negligently allowed the machinery to be in an unsafe condition, or had failed to furnish reasonably safe equipment.

Counts C and D specified that the unsafe machinery was a locomotive.

Demurrers to the counts being overruled, the defendants plead in short by consent, etc.

At the conclusion of the hearing below the court gave, at each defendants' request, the general charge without hypothesis, and the jury returned a verdict in favor of the defendants. Judgment was entered pursuant to the verdict. Plaintiff's motion for a new trial being overruled, an appeal was perfected to this court.

The basis of the plaintiff's claim of liability to plaintiff arises from a contract entered into between A B C and the Alabama Power Company, the Georgia Power Company, and Gulf Power Company, relative to purchase of coal by the power companies from a mine to be opened, constructed, equipped, and operated by A B C on lands owned by A B C. The defendant Southern Electric Generating Company was not a party to this contract. This mine was later known as the Maxine mine.

Under the contract the amount per ton of coal to be paid by the purchasers (power companies) is determined according to the amount of certain specified costs incurred by A B C in its mining operations, plus a profit of twenty-five cents per net ton of coal. The specified costs were listed as: amortized mine development cost and depreciation expense based on a formula set out in the contract; depletion; royalties; operating costs, including costs of maintenance and repairs to keep the plant in first-class condition; interest, salvage, price of development coal, and several other factors we see no need to set out. If the operations by A B C of its other seams of coal near the Maxine mine adversely or beneficially affected the costs of mining the Maxine mine, the price per ton of coal was to be increased or decreased accordingly by joint agreement, or by arbitration.

The contract provides for monthly billing for coal delivered, to be adjusted quarterly on the basis of actual price per ton, on quality of the coal to be mined; for mutual rights of arbitration, and for termination in event the B T U content of the mined coal is less than the established standards.

Under the contract the power companies reserved the right to terminate the contract on one year's notice under certain specified conditions. Upon termination and in any event upon the expiration of the contract, the power companies are required to pay A B C the unamortized development cost and the depreciated cost of the structures, improvements, railroads or railroad materials, facilities, material, equipment and supplies theretofore purchased by A B C for use in the mine. The contract also reserved to

the power companies the right of approval of the overall general plan for construction and development of the mine, approval of individual plans for opening the mine, right of approval of all capital expenditures of one thousand dollars or more for the construction, operation, development, and maintenance of the mine, and the right to object to the capital expenditures of less than one thousand dollars and to reduce inventory which is considered to be in excess of that reasonably required for the safe construction, operation, development, and maintenance of the mine. Any changes or modifications in or to said mine and its appurtenances, which might be required by or under any law, government regulation or union regulation applicable to coal mines in Jefferson and Walker Counties in Alabama, whether related to safety or otherwise, are to be made whether or not approved by the power companies under the contract.

The contract specifically provides that any disagreement between the parties to the contract as to the reasonableness of capital expenditures is promptly to be submitted to arbitration and the method for providing for arbitrators is set forth in the contract.

Southern Services, Incorporated, is appointed in the contract as agent for the power companies for the purposes, among others, of giving notices of demands authorized by the contract. This agent has never exercised any rights under the contract to disapprove of capital expenditures by A B C in its construction, operation, and maintenance of the mine nor of the right to require any reduction of inventory of supplies in connection therewith.

Counsel for appellant in brief contend that certain portions of the contract tend to establish the liabilty of the Alabama Power Company to the plaintiff in that the contract sets forth that power companies had been furnished by A B C its information covering the geological data where the mine was to be opened and recited that the power companies were familiar with such data, and with the operation of coal mines similar to that to be opened by A B C; that the contract provided that the location of the mine was to be mutually agreed upon, and that A B C was required to submit to the power companies a general plan for the mining operations, including major structures, improvements, railroads, facilities, developments, and equipment therefor, provisions also being included for the status between the parties if the power companies should fail or refuse to approve such plan.

Counsel for appellant states in brief:

"We are endeavoring to present only what we consider to be the pertinent provisions of the contracts relating to the duty arising on behalf of the Alabama Power Company to the employees of Alabama By-Products Corporation by virtue of the control by Alabama Power over the location, operation and supplying of the mine."

The evidence presented below shows that the appellant first commenced work at the Maxine mine as an employee of A B C in 1954, and continued in its employ under the direction of A B C until the time of his injury on 6 September 1962. During this period of employment A B C paid appellant's wages and furnished the tools with which he worked.

On 6 September 1962, the appellant was instructed by an assistant mine foreman of A B C to take a supply locomotive and mine car into the mine with a load of concrete blocks. This locomotive and mine car as well as the rails, ties, and spikes on which the locomotive was operating were purchased, installed and owned by A B C. The locomotive had been moved from another of its mines by A B C. Employees of A B C maintained the equipment in the mine including the locomotive and mine car.

While engaged in operating the locomotive, the appellant testified that the locomotive lurched and threw him off. The

appellant described in detail the alleged defective condition of the locomotive at the time, including depressed springs, flat wheels and a broken frame.

Appellant's witness, Hager, Vice President of A B C, testified that only employees of A B C had been used to operate Maxine mine since its opening in 1952, and that such employees had worked only under the direction of A B C, the details of the mining operation having been directed at all times by the mining staff of A B C.

Hager further testified that the Alabama Power Company had never inspected the mine or equipment therein for safety purposes, the safety inspections having been made only by inspectors of the state and federal governments and of A B C; that A B C on a regular and continuous basis inspected and maintained all of the equipment in the mine including the locomotives and mine cars. All maintenance work on the locomotives and mine cars was done by employees of A B C.

In the trial below the appellant sought to introduce the contract between the power companies and A B C. The appellees objected to the reception of the contract in evidence on the ground that the contract was irrelevant and immaterial.

Counsel for appellees also argues in brief that the instruments offered were unsigned copies of the contract, and therefore mere secondary evidence and properly excluded since there was no notice to produce, and no proper accounting for the absence of the originals.

We do not deny the possible merit of this contention, but prefer to consider the question in its broader aspects.

By its overall terms the contract was one for the purchase of coal on a cost plus basis. The ultimate costs, and particularly those imposed upon the power companies at the expiration of the contract were largely to be determined by the costs of operating and maintaining the mine and its machinery. Common prudence would dictate that the power companies reserve to themselves a means of controlling these costs. This they did by reserving to themselves some authority in the matter of operating costs, capital expenditures, and maintenance. While this authority was reserved, it was never exercised.

The contract placed upon A B C the sole owner and operator of the mine, the responsibility for the construction and operation of the mine, efficiently and in accordance with good mining practice.

The rights reserved to the power companies were obviously for their own protection, and not for the employees of A B C, the owner and operator of the mine. No property was delivered over to A B C by the power companies.

In Connors-Weyman Steel Co. v. Kilgore, 189 Ala. 643, 66 So. 609, a mine owner had leased a mine to an independent contractor. The lease contract provided that the mining operations were to be done to the satisfaction of the lessor's engineer. The court held this provision was for the protection of the lessor mine owner and not for the employees of the independent contractor.

We cannot see that the contract created any duty flowing from the power companies to the plaintiff. Certainly no standards of care were imposed. In this light the contracts were clearly irrelevant to the issues presented. See Ted's Master Service, Inc. v. Farina Bros. Co., Inc., 343 Mass. 307, 178 N.E.2d 268.

In Samuelson v. Cleveland Iron Mining Co., 49 Mich. 164, 13 N.W. 499, the plaintiff was an employee of a contractor who had leased defendant's mine. The contractor was to work the mine and deliver ore to the defendant owner for a certain price per ton. The plaintiff was injured while employed by the contractor for work in the mine. Among other provisions in the contract it was required that the mine " * * * be worked in a careful, prudent and workmanlike manner, *to the entire satis-*

*faction* of said (owner's) superintendent, and the making of the mine safe was the responsibility of the contractor, but \* \* \* under the supervision, advice and direction of said defendant's superintendent." (Emphasis and Par. ours.)

The Michigan court found that these reservations by the owner were no evidence that the defendant mine owner retained charge and control of the mine. The court wrote:

"The privilege of intervention for its own protection was reserved; but the neglect of one's own interest is no wrong to others. Legal wrongs must spring from neglect of legal duties \* \* \*"

Of course in the present case A B C was the sole owner of the mine, and the appellees mere purchasers of the coal mined by A B C.

■ Prior to ruling on the admissibility of the contracts, the court read and considered the contracts. Its conclusion that the contracts were irrelevant and therefore inadmissible was correct.

■■ Any duty owed by the appellees to the plaintiff had to arise from the contracts. Since no duty by the power companies to the appellant was created by the contracts there obviously was no liability on the part of the appellee growing out of appellant's injuries. In other words, the appellant had no valid cause of action against the appellees. The elements of actionable negligence are the existence of duty to protect a plaintiff from injury, a failure to perform that duty, and injuries resulting from a breach of such duty. Sprinkle v. St. Louis and S. F. R. Co., 215 Ala. 191, 110 So. 137.

Under the facts disclosed the court did not err in giving to the jury the appellant's written request for the affirmative charge, without hypothesis.

Other points are argued by counsel for appellant. In view of our conclusion that appellant had no cause of action against the appellees in any event, no purpose would be served in discussing these additional points.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.